**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

ROBERT ALDERETE,

       Plaintiff,

v.                                  No. CIV 17-500 JAP/LF

CITY OF ALBUQUERQUE, OFFICER
IGNAS DANIUS, in his individual capacity
and as employee of the City of Albuquerque;
OFFICER DAVID MONTANO, in his
individual capacity and as employee of the City
of Albuquerque; and DETECTIVE CHRISTIAN
D. BAKER, in his individual capacity and as
employee of the city of Albuquerque,

       Defendants.

**MEMORANDUM OPINION AND ORDER**

Plaintiff Robert Alderete (Mr. Alderete) brings claims under 42 U.S.C. § 1983 against

Defendants City of Albuquerque (City) and three individual police officers stemming from an

alleged unlawful seizure of Mr. Alderete and an alleged unlawful search of his vehicle.

COMPLAINT (Doc. No. 1-1). Mr. Alderete also brings a federal claim of malicious prosecution

against Defendants and state-law claims of negligent hiring, training, supervision, and retention,

respondeat superior, trespass, false arrest, false imprisonment, assault, and battery. *Id.* Mr.

Alderete's allegations arise from an August 27, 2015 arrest that occurred when Mr. Alderete and

his companion, "Courtney Cowboy," presented a personal check made out to Ms. "Cowboy" for

verification at a federal credit union in Albuquerque. The check was written on an account that

had been previously closed due to fraud. Mr. Alderete was arrested on charges of theft of

identity, receipt of stolen property, and possession of a firearm by a felon. The charges were later dismissed without prejudice.

Defendants Police Officers Ignas Danius (Officer Danius), David Montano (Officer Montano), and Christian D. Baker (Detective Baker) seek summary judgment based on qualified immunity, asserting, in part, that the officers did not unreasonably seize Mr. Alderete or unreasonably search his vehicle because the officers had a particularized and objective basis for suspecting Mr. Alderete was engaged in criminal activity and because the officers had probable cause to arrest him.[1] Due to their position that Mr. Alderete's arrest was based on probable cause, Defendants generally contend that all of Plaintiff's claims fail as a matter of law.

Mr. Alderete argues, in part, that Defendants are not entitled to qualified immunity because the arresting officers "had no specific facts that showed [Mr. Alderete] had any specific intent to commit any fraud …."[2] Thus, according to Mr. Alderete, Defendants should not be shielded by qualified immunity because the officers "clearly violated the requirement to find probable cause prior to making an arrest" and because the officers' conduct was objectively unreasonable. *Id.* at 16, 17.

Defendants counter that Mr. Alderete's primary argument regarding whether he did or did not actually present the personal check for payment at the bank, as opposed to merely attempt to verify the check at a bank teller's window, is a non-issue in terms of Defendants' summary judgment motion. Defendants represent that when "Officer Danius arrested Plaintiff,

---

[1] DEFENDANTS CITY OF ALBUQUERQUE, IGNAS DANIUS, DAVID MONTANO AND CHRISTIAN BAKER'S MOTION FOR SUMMARY JUDGMENT (Doc. No. 23) (Defendants' Motion).
[2] PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Doc. No. 29) (Plaintiff's Response at 29).

[Officer Danius] had developed probable cause that Plaintiff may have committed multiple crimes, none of which require evidence that Mr. Alderete attempted to cash the check at issue."[3]

Mr. Alderete has filed a cross-motion for summary judgment, arguing, in part, that because the undisputed facts show that Mr. Alderete did nothing more than attempt to verify the check in question, there was no basis for Officer Danius to have detained and arrested Mr. Alderete, or to have searched his vehicle. Mr. Alderete seeks summary judgment on only the federal constitutional claims and the malicious prosecution claim. He does not request summary judgment on any of the state law claims.[4] Mr. Alderete's Motion is fully briefed.[5]

On November 16, 2017, the Court held a hearing to address various questions raised by the parties' cross-motions for summary judgment. Both parties were represented by counsel, who presented argument at the hearing. After the hearing, Mr. Alderete submitted PLAINTIFF'S SUPPLEMENTAL BRIEFING ON PLAINTIFFS' (sic) MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF LAW IN SUPPORT (Mr. Alderete's Supplement) (Doc. No. 52). Mr. Alderete's counsel also provided the Court with additional video recordings of the incident. *See* Notice of Lodging of Exhibits 1-4 (Doc. No. 53).

---

[3] DEFENDANTS CITY OF ALBUQUERQUE, IGNAS DANIUS, DAVID MONTANO AND CHRISTIAN BAKER'S REPLY TO THEIR MOTION FOR SUMMARY JUDGMENT (Doc. No. 42) (Defendants' Reply at 1–2).
[4] PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF LAW IN SUPPORT (Doc. No. 36) (Mr. Alderete's Motion).
[5] DEFENDANTS CITY OF ALBUQUERQUE, IGNAS DANIUS, DAVID MONTANO AND CHRISTIAN BAKER'S RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF LAW IN SUPPORT [Doc. No. 36] (Doc. No. 44) (Defendants' Response); and PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF LAW IN SUPPORT (Doc. No. 48) (Mr. Alderete's Reply). *See also* Doc. Nos. 52–54.

Having considered the pertinent law and argument by counsel, along with the briefing, supplemental briefing, and all of the exhibits,[6] the Court finds that Defendants' Motion for Summary Judgment should be granted in part and denied in part, and that Plaintiff's Motion for Summary Judgment should be denied, in part. The Court will require additional briefing by both parties as explained below.

## Summary Judgment and Qualified Immunity

### A. __Summary Judgment__

Rule 56 directs that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party asserting that a fact is or cannot be genuinely disputed must support such assertion by "citing to particular parts of materials in the record," including affidavits, or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A), (B). In evaluating a request for summary judgment, the Court construes the non-movant's evidence as true, and all justifiable and reasonable inferences are drawn in the non-movant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

---

[6] Defendants identified their exhibits by letter, e.g., Defendants' Exhibits A–E. Defendants also filed with the Court a copy of Officer Danius's lapel camera video marked as Ex. A–1 (Danius Video #1) (Doc. No. 24). There is a corresponding transcript of Officer Danius's Video #1 (Ex. A–2). For some reason, Mr. Alderete did not identify his exhibits by numbers and, instead, also used letters for some of the exhibits. *See e.g.,* Mr. Alderete's Exhibits D–G. Mr. Alderete filed copies of two lapel camera videos: Ex. A–C (Montano Video) (Doc. No. 30) and Ex. H (Danius Video #2) (Doc. No. 34). There are no corresponding transcripts of these two videotapes. After the November 16 hearing, Mr. Alderete filed a single disc marked as Exhibits 1-4 (Doc. No. 53) containing four lapel camera video recordings. Two of the supplemental video recordings (Exhs. 1 and 2) were already submitted to the Court by Defendants as Ex. A-1 and by Plaintiff as Ex. H. Mr. Alderete should not have submitted video recordings that were already exhibits to earlier filed briefs. D.N.M. LR-Civ 10.7 ("An exhibit should be submitted only once and may later be referred to by document title and filing date."). The other two supplemental video recordings, Plaintiff's Ex. 3 and Ex. 4 contain new video footage but very little, if any, of these two recordings contains evidence material to the cross-motions for summary judgment. Mr. Alderete also marked as Ex. A to his Motion for Summary Judgment, a transcript from a state court sentencing hearing held October 19, 2015. *See* Mr. Alderete's Motion at 4, ¶ 21. When the parties both mark an exhibit with the same exhibit letter, the Court will refer to the exhibit as either Defendants' or Plaintiff's exhibit.

To defeat summary judgment, the nonmoving party must come forward with more than a showing of the "existence of a scintilla of evidence in support of the plaintiff's position;" "there must be evidence on which the [trier of fact] could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. However, "[a]t the summary judgment stage the judge's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Randle v. City of Aurora*, 69 F.3d 441, 453 (10th Cir. 1995) (citation omitted).

When both parties move for summary judgment, the Court will analyze each motion individually and on its own merits. *See Buell Cabinet Co. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979) (explaining that the denial of one motion for summary judgment does not always require the grant of a cross-motion for summary judgment). "Cross-motions for summary judgments, however, do authorize a court to assume that there is no evidence which needs to be considered other than that which has been filed by the parties." *Brubach v. City of Albuquerque*, 893 F. Supp. 2d 1216, 1223 (D.N.M. 2012) (citation omitted).

B.  **Qualified Immunity**

Because Defendants have raised qualified immunity as a defense, Mr. Alderete has the burden of showing that: (1) the Defendants violated his Fourth Amendment rights; and (2) the Fourth Amendment right was clearly established at the time Defendants engaged in the challenged conduct. *Malone v. Bd. of Cnty. Comm'rs for Cnty. of Dona Ana, et al.*, __ F. App'x __, 2017 WL 3951706, *5–6 (10th Cir. Sept. 8, 2017) (unpublished). However, the Court views the facts in the light most favorable to the non-moving party and resolves all factual disputes and reasonable inferences in its favor. *Henderson v. Glanz*, 813 F.3d 938, 952 (10th Cir. 2015)

If a "plaintiff successfully carries his two-part burden," "defendant bears the burden, as an ordinary movant for summary judgment, of showing no material issues of fact remain that

would defeat the claim of qualified immunity." *Estate of Booker v. Gomez,* 745 F.3d 405, 2014 WL 929157, at *3 (10th Cir. 2014) (citations omitted). Qualified immunity shields law enforcement officials from liability for harm caused by reasonable mistakes, "protecting all but the plainly incompetent or those who knowingly violate the law." *Herrera v. City of Albuquerque*, 589 F.3d 1064, 1070 (10th Cir. 2009) (quotation omitted).

## Undisputed Material Facts (UMFs)[7]

On August 27, 2015, Officer Danius and Officer Montano each received a call from the Albuquerque Police Department's (APD's) dispatch about a possible forgery at the Kirtland Federal Credit Union involving a female (later identified as "Courtney Cowboy") and a male (later identified as Mr. Alderete), who had presented a personal check for verification at the credit union. The banking term "verification" refers to looking up a bank account to see if there are sufficient funds to cover a check. APD dispatch informed the officers that the pertinent checking account had been closed some months before August 27, 2015 due to fraud.[8]

Upon arriving at the bank, Officer Danius found Mr. Alderete and Ms. "Cowboy," who matched the physical descriptions of the two individuals provided to Officer Danius by police dispatch. Mr. Alderete and Ms. "Cowboy" appeared to be waiting in an area near bank teller

---

[7] Many of the UMFs are taken from the Court's review of the video recordings as well as from other exhibits.

[8] Mr. Alderete disputes at least some of the facts in this paragraph based on his contention that comments or notes from APD dispatch informing police officers that the pertinent bank account was closed due to earlier fraudulent activity on the account are hearsay and cannot be considered as admissible evidence in deciding a summary judgment motion. Mr. Alderete's Response at 5, ¶¶ 1, 2. The Court disagrees and finds that the information from dispatch may be considered because it constitutes "the collective knowledge" of the officers and APD. *See, e.g., United States v. Hinojos*, 107 F.3d 765, 768 (10th Cir. 1997) (noting the Tenth Circuit Court's previous holding, "under the 'fellow officer' rule that law enforcement officers may pool their information and that reasonable suspicion is to be determined on the basis of the collective knowledge of all the officers involved."); *United States v. Madroza-Acosta*, 221 F. App'x 756, 760 (10th Cir. 2007) (in assessing the information possessed by a law-enforcement officer at the time of a stop, the Court will apply the "fellow officer" rule, which requires the Court to look at "the collective knowledge of all the officers involved[,]" including information that was conveyed "by an informant to a police dispatcher") (citation omitted); *United States v. Coronado*, 2017 WL 3397371, at *3 (D.N.M. Aug. 8, 2017) (arresting officer may rely on information or instructions relayed to him by other officers in making a seizure). .

windows. Officer Danius asked Mr. Alderete to speak to him outside the bank. Officer Montano

escorted Ms. "Cowboy" outside the bank separately, where they waited while Officer Danius

interviewed Mr. Alderete. When Mr. Alderete and Officer Danius moved outside, Officer Danius

stated that he wished to perform a quick pat down search of Mr. Alderete before they talked. Mr.

Alderete was agreeable, telling Officer Danius "okay, yeah, go for it." Danius Video #1.[9] After

giving his driver's license to Officer Danius, Mr. Alderete explained that he and Ms. "Cowboy"

had come to the credit union to verify a check because the people for whom they had performed

some automobile repair work had paid them $50 by cash and $350 by a check. Mr. Alderete

reported that a person named "Will" or "William" had given them the check for work done a

week earlier and that Mr. Alderete had driven his vehicle to the bank with Ms. "Cowboy" to

verify the check that they had unsuccessfully tried to verify by telephone. Mr. Alderete stated:

"we actually came here to get [the check] verified, to cash it because we did contract labor for

these people – I work on cars." Ex. A–2 at 3. Mr. Alderete repeatedly told Officer Danius that he

and Ms. "Cowboy" came to the bank because they wanted to verify the check to see if it was

good, but Mr. Alderete also said that he and Ms. "Cowboy" hoped to cash it.[10] *See id.* at 3 (lines

---

[9] At the November 16 motion hearing, Mr. Alderete's attorney argued that this initial pat down search was illegal.
*See* Alderete's Motion at 8 and Supplement 1, No. 1. But, Mr. Alderete's remarks to Officer Danius indicated
consent to the search.

[10] Mr. Alderete disputes Defendants' proposed UMF No. 6, which states that Mr. Alderete told Officer Danius that
he was at the bank to verify and cash the check. Mr. Alderete's Response at 5, ¶ 6. But, Officer Danius's Video #1
and the corresponding transcript confirm that both Mr. Alderete and Ms. "Cowboy" told the officers that they came
to the bank to verify and cash the check. Mr. Alderete's concern that "in many of the videos there are moments
wherein the audio portion is turned off and then comes back on again, for example the first part of Exhibit A and B"
is unclear. *See* Mr. Alderete's Response at 5 n.4. The Court did not observe moments where the audio portions of
the videos were turned off and on, and Defendants' Exhibits A and B, to which Mr. Alderete referred, are affidavits
of Officer Danius and Officer Montano rather than video recordings. As best as the Court can determine, the
sequence of the three recordings is: first, Officer Danius Video #1 (ending with the handcuffing of Mr. Alderete and
Ms. "Cowboy"); second, Officer Montano's Video (beginning with Officer Danius's checking documentation on a
computer in his cruiser; showing both Mr. Alderete and Ms. "Cowboy" handcuffed outside the bank; revealing Ms.
Salazar-Madrid's true identity; showing Officer Montano's search of Ms. Salazar-Madrid's purse); and third, Officer
Danius's Video #2 (showing Mr. Alderete sitting handcuffed outside the bank and Officer Danius's informing Mr.
Alderete of his Miranda rights). There is some minimal overlap between Officer Montano's Video and Officer
Danius's Video #2.

1, 13). There is no evidence, however, that either Mr. Alderete or Ms. "Cowboy" actually handed the check to a teller in an attempt to cash it.

Mr. Alderete remained outside with Ms. "Cowboy" and Officer Montano while Officer Danius went inside the bank to speak to bank employees. Officer Danius first spoke to the information desk representative, Susan Covnet, who told him that Mr. Alderete and Ms. "Cowboy" came to her and that Mr. Alderete asked Ms. Covnet to verify the check. Ms. "Cowboy" handed the check and her ID to Ms. Covnet (although Ms. Covnet may have obtained Ms. "Cowboy's" ID a short time later). When Ms. Covnet pulled up the account on her computer, the banking notes from the bank's security officer stated that the account was closed and directed the employee to call APD right away. Ms. Covnet advised Mr. Alderete and Ms. "Cowboy" that Ms. Covnet needed to speak to the bank tellers. After Ms. Covnet left Mr. Alderete and Ms. "Cowboy," Ms. Covnet went to the bank tellers and directed the tellers to call APD, which they did. Ms. Covnet returned to Mr. Alderete and Ms. "Cowboy" and told them to wait near the tellers' windows for a bank teller. At one point, a male bank teller told Mr. Alderete and Ms. "Cowboy" that the teller was busy with a "drive up window" client and would get back to them. Ms. Covnet told Officer Danius that she was surprised that Mr. Alderete and Ms. "Cowboy" waited as long as they did at the bank before the officers arrived.

The bank tellers had very little direct contact with either Mr. Alderete or Ms. "Cowboy." Neither the check nor Ms. "Cowboy's" ID was returned to Ms. "Cowboy." It appears from the video recording that Ms. Covnet gave Officer Danius both the original check made out to Ms. "Cowboy" and Ms. "Cowboy's" driver's license. At one point within the first 15 minutes of his investigation, Officer Danius remarked to the bank employees that he was not sure if "the guy"

(Mr. Alderete) was actively involved in trying to cash the check or if was just "the girl" (Ms. "Cowboy").

Officer Danius obtained a printout of the bank's security notes on the closed account. Either the security notes or the information relayed to Officer Danius by APD dispatch, or both, indicated that the account holder had previously closed his bank account after the owner's checkbook was stolen sometime earlier in the year. Some months before August 27, 2015, an unidentified individual or individuals had presented a fake ID in an attempt to cash fraudulent checks on the closed account and they were arrested and criminally charged. Mr. Alderete and Ms. "Cowboy" were asking to verify a check made out on this same closed account.

After speaking to bank employees, Officer Danius returned outside and interviewed Ms. "Cowboy," while Officer Montano remained with Mr. Alderete outside the bank. Officer Danius asked Ms. "Cowboy" about the driver's license she had presented to Ms. Covnet, and Ms. "Cowboy" volunteered that she knew there was a problem with her driver's license and that there was possibly some missing information on the license. But, she did not explain what the problem was.

Ms. "Cowboy" told Officer Danius that the people for whom she and Mr. Alderete had performed work had made out a check for $350 to her in the name of "Courtney Cowboy." Like Mr. Alderete, Ms. "Cowboy" told Officer Danius that she and Mr. Alderete had come to the bank to verify the check, and similar to Mr. Alderete, she said that they ultimately wanted to cash it. *Id.* at 24 (line 14). "So the point is to cash [the check]." *Id.* at 24–25. Ms. "Cowboy" knew very few details about the person who had paid them for the work. She told Officer Danius that she did not pay much attention to the people for whom they worked because she and Mr. Alderete were struggling for money. Ms. "Cowboy" also did not seem to know her own home address or

whether she was living with Mr. Alderete, whom she told Officer Danius was her supposed boyfriend. When asked why the check was made out in Ms. "Cowboy's" name, she gave no explanation other than to say she, too, performed some of the work.

After hearing Ms. "Cowboy's" answers to questions, Officer Danius advised Ms. "Cowboy" that there was an issue with the check and told her he was detaining her and placing her in handcuffs while he continued his investigation. In explaining why he was handcuffing Ms. "Cowboy," Officer Danius stated he did not want Ms. "Cowboy" to "go anywhere" while he continued the investigation. Officer Danius then told Mr. Alderete that he, too, was being detained and placed in handcuffs. Officer Danius told Mr. Alderete "You're not under arrest yet. You're being detained." At that point, there were remarks by Officer Montano and by Mr. Alderete to Officer Danius that Mr. Alderete was currently on probation. Mr. Alderete told Officer Danius that his probation was not related to charges of fraud.

Officer Montano's Video shows Officer Danius inside the police cruiser examining Ms. "Cowboy's" driver's license and finding it suspicious looking. Mr. Alderete and Ms. "Cowboy" continued to talk together even though they had been instructed not to converse. At one point, Mr. Alderete called Ms. "Cowboy" by the name of Kayla in front of Officer Montano.[11] Ms. "Cowboy" was upset with Mr. Alderete for calling her Kayla. Officer Montano reported to Officer Danius that Ms. "Cowboy's" name was Kayla not Courtney. Ms. "Cowboy" finally, albeit reluctantly, disclosed that her true full name was Kayla Salazar-Madrid, explaining that she had a warrant out for her arrest. Officer Montano again told Ms. Salazar-Madrid that she was

---

[11] Mr. Alderete disputes Defendants' UMF No. 16 regarding Mr. Alderete having called Ms. Salazar-Madrid "Kayla," but this conversation between Mr. Alderete and Ms. Salazar-Madrid can be heard on Officer Montano's Video. In Mr. Alderete's Supplement, counsel represented that she had "conducted a diligent search of all videos and ha[d] not been able to locate where there is any evidence showing that Defendant Danius had any knowledge that Plaintiff called Ms. Madrid Kayla …." Mr. Alderete's Supplement at 6, fact 22. But, the Montano Video clearly shows the exchange between Mr. Alderete and "Kayla" and also contains footage where Officer Montano told Officer Danius that Mr. Alderete called Ms. "Cowboy" by the name "Kayla." Defendants' UMF No. 16 is undisputed.

being detained.[12] Officer Montano began to inspect the contents of Ms. Salazar-Madrid's purse and eventually found multiple fake drivers' licenses with various names, a high school diploma in another name, several wallets, several social security cards, photocopies of a $50 bill and of a $100 bill, some pills, and cash.

Mr. Alderete gave Officer Montano permission to open the passenger side door of Mr. Alderete's car and pull down the visor to get the vehicle registration and bill of sale. Officer Danius's Video #2 shows Mr. Alderete talking to Officer Danius and insisting that Mr. Alderete has done nothing wrong. Officer Danius informed Mr. Alderete of his rights and again explained that he was still just detaining Mr. Alderete. Officer Danius asked Mr. Alderete if he realized that there was a warrant for Ms. Salazar-Madrid's arrest and if Mr. Alderete knew she was using a false name. Mr. Alderete admitted to knowing this but said he did not know she had a false ID.

Officer Danius continued to inform Mr. Alderete that he was being detained.[13] Before placing Mr. Alderete in the police cruiser, Officer Danius asked him if there was anything in his pockets that might poke Officer Danius. Officer Danius's Video #2 shows Officer Danius patting down Mr. Alderete's pockets; Mr. Alderete can be heard saying he had a crack pipe in his pocket. Mr. Alderete told Officer Danius that his family lived nearby and asked if Officer Danius would contact his family so that they could pick up Mr. Alderete's vehicle. Officer Danius told Mr. Alderete that he could not promise anything and that they would deal with that later. Mr. Alderete challenges the lawfulness of the search and seizure of his person as well as the later search of his vehicle.

---

[12] At this point, Officer Montano states in his affidavit that Ms. Salazar-Madrid was arrested, after which Officer Montano began inventorying her purse. Montano Aff. ¶¶ 4, 5. But while Officer Montano's Video shows Officer Montano searching Ms. Salazar-Madrid's purse, none of the video recordings capture an officer telling Ms. Salazar-Madrid that she was under arrest.

[13] Mr. Alderete insists that there can be no dispute that he was arrested and not detained. Mr. Alderete's Response at 7, ¶ 19. However, the footage from the three videotapes does not show the officers telling Mr. Alderete that he was under arrest.

As already noted, the video recordings do not show the officers informing either Mr. Alderete or Ms. Salazar-Madrid that they were under arrest. Officer Danius stated that he found a fake New Mexico driver's license in Mr. Alderete's wallet with Mr. Alderete's photo on it and the name of "Michael Strickland." Danius Aff. ¶ 11; Plaintiff's Ex. 4 (Danius Video #4). Officer Danius also noted: "Given that Mr. Alderete was under arrest, we prepared to tow the vehicle." *Id.* ¶ 13. During the tow inventory of Mr. Alderete's car, Officer Montano found a loaded firearm with a magazine and thirteen 40 cal. bullets between the driver's side door and the driver's seat. Montano Aff. ¶ 6. Officer Montano reported that he could see the "large black handgun" by looking in through the driver side window. *Id.* In addition, Officer Montano found a black tar substance (later identified as heroin) and numerous syringes in Mr. Alderete's car.

After Mr. Alderete was booked, the Prisoner Transport Center searched Mr. Alderete and discovered a white powder on him that later was confirmed to be methamphetamine. Danius Aff. ¶ 15. Detective Baker, who was called to the scene for assistance, filed a Criminal Complaint against Mr. Alderete, charging him with theft of identity, receipt of a stolen firearm, and felon in possession of a firearm. On December 22, 2015, these charges against Mr. Alderete were dismissed without prejudice, vis-à-vis a Nolle Prosequi.

Although not pertinent to deciding the present legal issues, the Court provides some background information regarding Mr. Alderete's criminal history. Before his August 27, 2015 arrest at the federal credit union, Mr. Alderete had entered into a plea agreement related to drug charges in a state court proceeding, *State v. Alderete*, No. CR 2013-4193. The State had agreed not to seek enhancement of Mr. Alderete's sentence under the Habitual Offender Act if Mr. Alderete abided by the conditions of release before his September 23, 2015 sentencing hearing. Provided Mr. Alderete abided by these conditions, his period of incarceration was expected to be

between 0 and 3 years. However, based on the August 27, 2015 arrest, the sentencing court allowed the State to withdraw from the terms of the plea agreement and to seek the habitual offender enhancement. Mr. Alderete was sentenced to a term of imprisonment of four years. *See* Plaintiff's Ex. A (October 19, 2015 sentencing hearing transcript), attached to Mr. Alderete's Motion.

Mr. Alderete moved for a rehearing after obtaining a transcript of the lapel video depicting Officer Danius's interactions with credit union employees. Motion for Rehearing, Ex. G to Plaintiff's Response. In August 2016, after considering the transcript and after hearing testimony, the State Court found there had been no evidence that Mr. Alderete ever presented the check for payment. Thus, the State Court concluded that the officers did not have probable cause to arrest Mr. Alderete. Order Granting Defendant's Motion to Reconsider at 1, Ex. E to Plaintiff's Response. Accordingly, the State Court required that Mr. Alderete, who had then served about one year in prison, be sentenced under the original plea agreement. He was then released from prison.

Mr. Alderete claims that he suffered mental distress, anguish, fear, severe anxiety, and emotional suffering, at least in part, because of his incarceration. Complaint ¶ 20.

**Discussion**

## I.  <u>Alleged Sham Affidavits of Police Officers</u>

The Court first addresses Mr. Alderete's contention that the Defendant police officers' affidavits should not be considered because some of the affidavit statements of Officers Danius and Montano conflict with footage in the lapel camera videos. Mr. Alderete's Response at 2. Mr. Alderete argues, for example, that "Officer Montano's video Exhibit B at 3:08-4:00" shows that "Ms. Salazar-Madrid is patted down and her purse is searched while she is outside and before

she is placed in handcuffs[.]" Mr. Alderete claims this footage contradicts Officer Montano's Affidavit, which states, in part, "Following Ms. Salazar-Madrid's arrest, I did an inventory of her purse." *See* Montano Aff. ¶ 5.

The Court carefully reviewed all of the videos. *See, e.g.,* Officer Danius's Video #1 (Defendants' Ex. A-1, lasting 30 minutes); Officer Montano's Video (Plaintiff's Ex. A-C, lasting 30 minutes); Officer Danius's Video #2 (Plaintiff's Ex. H, lasting 8 minutes); Officer Danius's Video #3 (Plaintiff's Ex. 3, lasting 1:30 minutes); and Officer Danius's Video #4 (Plaintiff's Ex. 4, lasting 5:49 minutes).[14] The Court's task is made difficult by Mr. Alderete's reference to Officer Montano's Video as "Exhibit B at 3:08-4:00." Exhibit B is a defense exhibit consisting of a 2-page Affidavit of Officer Montano. The reference to 3:08-4:00 appears to reflect the time that has elapsed in a video, but the Court's review of Officer Montano's Video (Plaintiff's Ex. A–C) does not show Ms. Salazar-Madrid being patted down at a time marker of 3:08-4:00. However, in Officer Danius's Video #1 (Defendants' Ex. A-1), Ms. Salazar-Madrid is seen being handcuffed by Officer Danius about 24 to 25 minutes into the recording. At about 11 to 12 minutes into Officer Montano's Video (Plaintiff's Ex. A-C), the footage shows Officer Montano patting down Ms. Salazar-Madrid after she was already in handcuffs and before placing her in Officer Montano's police cruiser (to prevent the two suspects from conversing together). Officer Montano began a search of Ms. Salazar-Madrid's purse after she was in his police cruiser at about 18 minutes into Officer Montano's Video and then again at about 19 minutes into the same video.

The video footage does not corroborate Mr. Alderete's accusations of inconsistencies between the video footage and Officer Montano's Affidavit. Ms. Salazar-Madrid's purse was

---

[14] The Court also reviewed the two supplemental videos filed by Plaintiff after the hearing. But, these two videos (Plaintiff's Ex. 3 and 4 (Doc. No. 53), which last 4:33 minutes and 5:45 minutes respectively), supply little, if any, material evidence.

searched after she was handcuffed, rather than before, as asserted by Mr. Alderete. And, it simply is not clear from the videos at what point, Ms. Salazar-Madrid was placed under arrest. Moreover, this argument by Mr. Alderete does not relate to the issues *he* is raising as to whether the police officers had probable cause to seize *him*. *See also* Mr. Alderete's Response at 3 (discussing again when Ms. Salazar-Madrid was arrested).

Mr. Alderete also argues that Officer Montano's Video "Exhibit B at 27:20" shows he is placed in handcuffs" and that "it is clear at this point that the Officers still do not have probable cause that Plaintiff has committed any crime. Additionally, Plaintiff is never read his Miranda rights after he is placed in handcuffs." Mr. Alderete's Response at 2–3. The video footage at about 24 to 25 minutes into Officer Danius's Video #1 (Defendants' Ex. A-1) shows Officer Danius placing Mr. Alderete in handcuffs and specifically advising him that he is being detained rather than arrested. Officer Danius's Video #2 (Plaintiff's Ex. H) consists of footage taken after Mr. Alderete is in handcuffs. Mr. Alderete is heard again trying to explain to Officer Danius that he and Ms. Salazar-Madrid only came to the bank to verify the check. Officer Danius told Mr. Alderete that he wanted to advise him of his Miranda rights because of Mr. Alderete's continued attempts to talk about the incident. At about 1 to 2 minutes into Officer Danius's Video #2, Officer Danius informs Mr. Alderete of his Miranda rights. At about 5 minutes into this same video, Officer Danius again tells Mr. Alderete that he has not arrested him and that Mr. Alderete is still being detained. Because Mr. Alderete was becoming more upset, Officer Danius decided to place Mr. Alderete in his police cruiser, but before he does, Officer Danius pats down Mr. Alderete, and finds a crack pipe in Mr. Alderete's pockets.

Again, the sequence of events as recorded in the videos does not support Mr. Alderete's accusations of inconsistencies or contradictions. The Court does not find any evidence that the

police officers "elaborately compose[d] a story" that would benefit them nor does the Court find itself forced to make credibility choices as argued by Mr. Alderete. *See* Mr. Alderete's Response at 2. Thus, the Court will consider all of the evidence, including the officers' affidavits and the video recordings.

## II. <u>Fourth Amendment Seizure/Arrest Claim</u>

### A. *Parties' Positions:*

Mr. Alderete argues that the individual Defendant officers are not entitled to the defense of qualified immunity because they seized and/or arrested him without probable cause. Mr. Alderete's Response at 14. More specifically, Mr. Alderete asserts that the relevant New Mexico offense of forgery or identity theft is a specific intent crime and that the police officers did not have any "specific facts that showed that [Mr. Alderete] had any specific intent to commit any fraud…." *Id.* at 15. Mr. Alderete further contends that the law was clearly established at the time of his arrest that a government official had to have probable cause as to the applicable *mens rea* to make a valid arrest for a specific intent crime. *Id.* at 16.

Defendants counter that Officer Danius developed probable cause to arrest Mr. Alderete for the following crimes: "fraud, forgery and/or identity theft; conspiracy to commit fraud, forgery and/or identity theft; and/or attempt to commit fraud or forgery …." Defendants' Reply at 11. Defendants state that "it is inexplicable" why Mr. Alderete's Response addressed probable cause to arrest in relation to only the crimes of forgery and identity theft. *Id.* Defendants further assert that the probable cause inquiry is not limited to a particular offense, but only requires that an officer had reason to believe that a crime, "any crime," had been committed. *Id.* at 10.

B.  *Pertinent Fourth Amendment Legal Standard*

A warrantless arrest does not violate the Fourth Amendment if an officer has probable cause to believe that the arrestee committed a crime. *Rife v. Okla. Dep't of Pub. Safety*, 854 F.3d 637, 645 (10th Cir.), *cert. denied,* 2017 WL 3731208 (Oct. 16, 2017). Stated differently, "a warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004). "Probable cause exists if facts and circumstances within the arresting officer's knowledge and of which he or she has reasonably trustworthy information are sufficient to lead a prudent person to believe that the arrestee has committed or is committing an offense." *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1312 (10th Cir. 2002) (citation omitted). "[W]hen an officer has probable cause to believe a person committed even a minor crime in his presence[,] … the ... arrest is constitutionally reasonable." *Virginia v. Moore*, 553 U.S. 164, 171 (2008). A court examines "whether, given all of the circumstances, there is a probability or substantial chance of criminal activity based on commonsense consideration." *United States v. Coronado*, 2017 WL 3397371, *3, No. CR 16-3076 JCH (D.N.M. Aug. 8, 2017) (unpublished).

Probable cause does not require certainty or proof beyond a reasonable doubt, but it requires more than a mere suspicion of unlawful conduct. *United States v. Martin*, 613 F.3d 1295, 1302 (10th Cir. 2010). *See Illinois v. Gates*, 462 U.S. 213, 243 n.13 (Probable cause as its name implies, "requires only a probability or substantial chance of criminal activity[.]"), *reh'g denied,* 463 U.S. 1237 (1983). "'Arguable probable cause' exists when 'the officers' conclusions rest on an objectively reasonable, even if mistaken, belief that probable cause exists." *Stonecipher v. Valles*, 759 F.3d 2 1134, 1141 (10th Cir.), *cert. denied,* 135 S.Ct. 881 (2014).

C. *Analysis:*

1. <u>*Timing of Arrest*</u>[15]

Before Officer Danius handcuffed Mr. Alderete (Officer Danius's Video #1), Officer Danius told Mr. Alderete several times that he was not yet being arrested and was merely being detained while the police officers continued to investigate. But, by the time Officer Danius had handcuffed Mr. Alderete, about 25 minutes into the investigation, Mr. Alderete was clearly not free to leave the scene. At this point, the encounter closely resembled a traditional arrest. *See Morris v. Noe*, 672 F.3d 1185, 1192 (a detention becomes an arrest if it continues for an excessive time or closely resembles an arrest) (citation omitted). *See also Cortez v. McCauley*, 478 F.3d 1108, 1115–16 (10th Cir. 2007) (observing that the "use of firearms, handcuffs, and other forceful techniques" generally enters the "realm of an arrest".) Thus, for purposes of deciding the summary judgment motions, the Court will consider Mr. Alderete to have been arrested when Officer Danius handcuffed him[16] and will next examine whether Officer Danius had probable cause, at that time, to support the arrest.

2. <u>*Probable Cause to Arrest Mr. Alderete*</u>

Upon being dispatched to the bank, Officer Danius learned that a check had been presented to the bank that was written on a closed account because of earlier fraudulent activity. After arriving at the bank, Officer Danius carefully and thoroughly conducted an investigation that included interviews of Mr. Alderete, Ms. Salazar-Madrid, and various bank employees.

---

[15] Although Mr. Alderete identified his Fourth Amendment claim as an "Unreasonable Seizure," Complaint (Count I), he primarily argues that the warrantless arrest was unlawful. *See, e.g.,* Mr. Alderete's Motion at 10–13. In fact, Mr. Alderete conceded that the "initial seizure was reasonable." *Id.* at 8. Mr. Alderete asserted, however, that the seizure "quickly became unlawful after Defendant Danius spoke to the bank employees." *Id.* The Court disagrees. In order to conduct a thorough investigation, Officer Danius not only had to interview the bank employees, he also had to question Ms. Salazar-Madrid. The Court analyzes the claim as an unlawful warrantless arrest that was triggered by the handcuffing of Mr. Alderete.

[16] At the November 17 motion hearing, Plaintiff's attorney stated that the time of the arrest was the moment when Officer Danius handcuffed Mr. Alderete. Defense counsel did not dispute that the arrest occurred then but argued that Officer Danius had probable cause even before he handcuffed Mr. Alderete.

Officer Danius confirmed that the pertinent check was written on a closed account consistent with the information relayed to him by dispatch. Officer Danius examined the check made out to Ms. "Cowboy," the ID that she presented to the bank, and banking notes on the account in question showing it previously had been closed due to fraudulent activity. The video recordings show both police officers attempting to verify Ms. "Cowboy's" identity on computers in the police cruisers.

During the interviews of Mr. Alderete and of bank employees, Officer Danius learned that while Mr. Alderete and Ms. Salazar-Madrid sought to first verify the check, they had driven to the bank together in Mr. Alderete's car with the intention to cash the check. Although both Mr. Alderete and Ms. Salazar-Madrid approached the bank representative about verification of the check made out to Ms. "Cowboy," Mr. Alderete did the talking and requested verification of the check.

Officer Danius's interview of Ms. Salazar-Madrid elicited suspicious information. Ms. Salazar-Madrid first spoke about some vague problem with the MVD and her driver's license (in the name of "Courtney Cowboy"), which she was unable to clearly explain. She did not know much about the work on a car that she supposedly helped Mr. Alderete perform. Even though it appeared that Mr. Alderete had done most of the work on the car, Ms. Salazar-Madrid was unable to explain to Officer Danius why the check in her possession, that had been issued in partial payment for the work, was made out in her supposed name. She did not know the names of the people for whom they did work on the car. She was uncertain of where she lived or if she lived with Mr. Alderete and whether he was even her boyfriend. Ms. Salazar-Madrid's failure to respond appropriately to Officer Danius's questions lends support for Officer Danius's reasonable belief that criminal activity was afoot, especially here where Officer Danius faced

suspicious conduct concerning a checking account that had been closed earlier due to fraudulent activity. *See, e.g., Painter v. City of Albuquerque*, 383 F. App'x 795, 799 (10th Cir. 2010). Officer Danius learned all of these facts during his investigation before handcuffing and arresting Mr. Alderete.

Moreover, this is not a case where Mr. Alderete's conduct appears "inherently innocuous" or where his actions had "plausible innocent explanations." *See* Plaintiff's Response at 15. Non-involvement in criminal activity might have been a plausible inference if Mr. Alderete had merely driven Ms. Salazar-Madrid to the bank, dropped her off, and let her go into the bank alone for verification of a check made out in her supposed name. However, before the arrest, the undisputed facts reveal that Mr. Alderete took charge by entering the bank and by asking for verification of a check that was not even made out in his name. He accompanied Ms. Salazar-Madrid at every step of the scheme. The Court is unpersuaded by Plaintiff's counsel's argument that probable cause for the arrest could not have existed because Officer Danius, himself, questioned whether Mr. Alderete was actively involved. *See, e.g.,* Mr. Alderete's Motion at 11. Plaintiff's counsel repeatedly cited video footage where Officer Danius, midway in his investigation, stated to a bank representative that he could not tell if Mr. Alderete or just Ms. Salazar-Madrid was involved. But, by the time he handcuffed Mr. Alderete, Officer Danius had learned that Mr. Alderete had been the one who asked that the check be verified, and Officer Danius had interviewed Ms. Salazar-Madrid whose answers to questions raised additional suspicions.

In light of all the facts within Officer Danius's knowledge and of which he had reasonably trustworthy information, the Court concludes that Officer Danius had probable cause to believe that Mr. Alderete intended to act fraudulently when he attempted to verify the check in

order to cash it. In other words, Officer Danius's belief that Mr. Alderete was engaging in criminal conduct was reasonable. Here, common sense and the facts known by Officer Danius were sufficient to warrant a person of reasonable caution to believe that Mr. Alderete was engaged in a criminal offense involving fraud and/or that Mr. Alderete intended to commit a fraud. Thus, the facts known to Officer Danius meet the probable cause standard of "probability or substantial chance of criminal activity," and Mr. Alderete's arrest did not violate the Fourth Amendment.

Therefore, Defendants are entitled to qualified immunity on the Count I Fourth Amendment Claim, which will be dismissed with prejudice.[17] In addition, having found that Officer Danius had probable cause to arrest Mr. Alderete, the Court will grant Defendants' Motion for Summary Judgment on the state-law claims of false arrest, false imprisonment, and assault and battery[18] against the Defendant Officers. Accordingly, the Count VI state-law claims of false arrest, false imprisonment, assault, and battery will be dismissed with prejudice. Similarly, to the extent that Plaintiff's claim of negligent hiring, training, supervision, and retention against the City is premised on the claims of alleged false arrest, false imprisonment, assault, and battery, the Count III negligent hiring, training, supervision, and retention claim will be dismissed with prejudice.

---

[17] The Court has the discretion to decide either of the two prongs of the qualified immunity analysis first. *Courtney v. Okla. ex rel. Dep't of Pub. Safety*, 722 F.3d 1216, 1222 (10th Cir. 2013). Having decided that Mr. Alderete did not satisfy his burden of showing a violation of a constitutional right, the Court does not reach the second prong of the test.

[18] Mr. Alderete alleges that "Defendants' illegal detention and arrest of Plaintiff" constitute false imprisonment, assault, and battery. Complaint ¶ 79. There are no other allegations to support the claims that Defendants falsely imprisoned, assaulted, and/or battered Mr. Alderete. *See, e.g.,* Mr. Alderete's Response at 22–23 (arguing only that Plaintiff's state tort claims survive if Plaintiff was falsely seized and/or arrested). However, in Mr. Alderete's Supplement, ¶ 21, he asserts that after he was arrested, he was in "very tight handcuffs now for close to twenty (20) minutes now…." Notwithstanding this assertion, Plaintiff does not argue that the use of tight handcuffs constituted a battery. Moreover, the two supplemental video recordings (Plaintiff's Exhs. 3 and 4) both show Officer Danius loosening the handcuffs after Mr. Alderete's tells Officer Danius that they are too tight. If the Court has misconstrued Mr. Alderete's argument regarding his state-law claims, he may file an appropriate motion by December 19, 2017.

III.     **Fourth Amendment Vehicle Search Claim**

Mr. Alderete asserts that the search of his vehicle was unlawful because Defendants did not have probable cause to arrest him. Mr. Alderete's Motion at 13. *See* Complaint ¶¶ 37–39 (alleging that because Officer Danius had no probable cause to arrest Mr. Alderete, the subsequent search of the vehicle was unreasonable). Mr. Alderete also takes that the position that while exigent circumstances might justify a warrantless search of a vehicle, Defendants have not proven an exigency. Mr. Alderete's Motion at 13–14.

In a two-sentence argument with citations to New Mexico state court cases, Defendants contend that there was probable cause for the arrest and that inventorying the contents of a vehicle before towing is a well-recognized exception to the warrant requirement. Defendants' Motion at 19. Defendants' Reply does not address the alleged unlawful search of the vehicle.[19] But, in Defendants' Response to Mr. Alderete's Motion, Defendants maintain that Mr. Alderete conceded that a vehicle inventory before towing is lawful if probable cause existed for the arrest. "Given Officer Danius's probable cause to arrest Plaintiff, the inventory of Plaintiff's car for purposes of having it towed was lawful, as acknowledged by Plaintiff. [*See* Doc. 36, pg 13 ("An officer may search a vehicle [] if he has probable cause[.]")]." Defendants' Response at 17. Defendants, however, did not respond to Mr. Alderete's position that an exigency must exist to justify a warrantless search of a vehicle.

Because the Court found the briefing unhelpful on the unlawful vehicle search claim, the Court wrote counsel before the November 16 hearing, asking counsel to address a number of questions. At the hearing, Mr. Alderete's attorney clarified that Plaintiff was not conceding that the vehicle search was reasonable in the event the Court concluded that Officer Danius had

---

[19]In his Response to Defendants' Motion, Mr. Alderete similarly gave short shrift to the alleged unlawful vehicle search claim other than to summarily dispute that the vehicle search was lawful. Plaintiff's Response at 8, No. 25.

probable cause for the arrest. Counsel for Plaintiff argued Defendants had no basis to conduct an inventory search of Mr. Alderete's car and that the police did not search the car in accordance with standard police procedures.

At the hearing, both attorneys supplied the Court with copies of court decisions they believed pertinent to the vehicle search claim. Yet, the parties had not relied on any of these cases in the summary judgment briefing. Defense counsel gave the Court a copy of APD's Towing and Wrecker Services policy and rules ("Towing Policy") that became effective September 4, 2002 and asserted that Defendants had properly followed procedure because page 2 of the Towing Policy requires a vehicle to be towed when the car is on someone's property.

The Towing Policy states that the towing of vehicles is authorized "when necessary as a matter of public safety, to protect property, to preserve evidence, and to remove abandoned vehicles from city streets and property." Towing Policy at 1, 2–48. The Towing Policy also provides that a vehicle "will be towed when" a driver has been arrested, "or when the vehicle cannot be released to a responsible party." *Id.* at 1, 2–48–2(A). It is possible that the Court misheard defense counsel's reference to page 2 of the Towing Policy, but the Court did not locate a provision on page 2 of the Towing Policy stating that a vehicle must be towed when on someone's property. Page 2 of the Towing Policy states that the officer authorizing the towing of a vehicle "will document the justification for the towing of the vehicle." *Id.* at 2, 2–48–3(B).

The Court reviewed the affidavits of Officer Danius and of Officer Montano, but neither officer stated that he authorized the vehicle search nor did either officer document the reasons that justified the vehicle search. Officer Danius averred that "[g]iven Mr. Alderete was under arrest, we prepared to tow the vehicle[,]" and that Office rMontano conducted a tow inventory.

Danius Aff. ¶¶ 13, 14 (Doc. No. 23–1). Officer Montano affirmed he did an inventory search of the vehicle after Mr. Alderete's arrest. Montano Aff. ¶ 6.

Moreover, at the hearing, Mr. Alderete's attorney stated she did not concede that the Towing Policy provided by defense counsel was the applicable policy in August 2015 when Mr. Alderete was arrested. Counsel were to confer after the hearing to determine which towing policy was in effect in August 2015. But, in submissions to the Court after the hearing, no one mentioned the applicable towing policy, and the Court does not know if the 2002 Towing Policy was in effect when Mr. Alderete was arrested.

In his Supplemental briefing, Mr. Alderete provided several citations to the video recordings where he asked Officer Danius if his family would be allowed to come and get Mr. Alderete's car. Mr. Alderete's Supplement at 6, Nos. 1–4. Even assuming the 2002 Towing Policy applies, it is not clear whether the language of that policy authorizes or requires a vehicle to be towed when the vehicle can be released to a responsible party. *See* Towing Policy at 1, 2–48–2(A).

Based on the argument and evidence presented, the Court does not know who authorized the search of Mr. Alderete's vehicle, what reasons justified the search, or if the police complied with standardized policies and procedures that were in effect in August 2015. As a result, there are genuine disputes of material fact with respect to whether the vehicle search was a violation of Mr. Alderete's Fourth Amendment rights. Because the facts are either in dispute or unclear, and because the parties did not provide adequate briefing of the pertinent legal standards, the Court will require both parties to file supplemental briefs, with evidence, on the Count II Fourth Amendment claim as to the vehicle search. The briefs should not exceed ten pages and must be

filed no later than December 19, 2017. After reviewing the briefs and evidence, the Court will resolve the cross-motions on the Fourth Amendment unlawful vehicle search claim.

### IV. **Malicious Prosecution Claim**

At the November 16 hearing, Plaintiff's attorney conceded that the malicious prosecution claim would fail if the Court determined that Officer Danius had probable cause to arrest Mr. Alderete. Therefore, based on the Court's conclusion that Officer Danius had probable cause to arrest Mr. Alderete, the claim of malicious prosecution necessarily fails and the Court will dismiss with prejudice Plaintiff's Count IV- Malicious Prosecution Claim.

IT IS THEREFORE ORDERED that:

(1) DEFENDANTS CITY OF ALBUQUERQUE, IGNAS DANIUS, DAVID MONTANO AND CHRISTIAN BAKER'S MOTION FOR SUMMARY JUDGMENT (Doc. No. 23) is GRANTED in part and denied in part, with the following results:

    a. Plaintiff's Count I Fourth Amendment Claim (Unreasonable Seizure and/or Unlawful Arrest) will be dismissed with prejudice;

    b. Plaintiff's Count III Negligent Hiring, Training, Supervision, and Retention Claim as it relates to the Count I Fourth Amendment Claim will be dismissed with prejudice;

    c. Plaintiff's Count IV Malicious Prosecution Claim will be dismissed with prejudice;

    d. Plaintiff's Count V Respondeat Superior Claim as it relates to the Count I Fourth Amendment Claim will be dismissed with prejudice; and

e. Plaintiff's Count VI State Tort Claims of False Arrest, False Imprisonment, Assault, and Battery will be dismissed with prejudice;

(2) Defendants and Plaintiff must file supplemental briefs and evidence on the Count II Fourth Amendment Claim (Search of Vehicle) no later than December 19, 2017, after which the Court will resolve the cross-motions for summary judgment on this claim and the related state law claims of trespass, .negligent hiring, training, supervision, and retention, and respondeat superior; and

(3) PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF LAW IN SUPPORT (Doc. No. 36) is DENIED, in part, consistent with this opinion.

_____

SENIOR UNITED STATES DISTRICT JUDGE